IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

ROBERT L. ROGERS,            )
                             )
         Plaintiff,          )
                             )
         v.                  )    CIVIL ACTION NO.
                             )    2:00cv109-MHT
MICHAEL HALEY, etc.,         )        (WO)
et al.,                      )
                             )
         Defendants.         )


OPINION

In this lawsuit, plaintiff Robert L. Rogers, a white
employee of the Alabama Department of Corrections (ADOC),
claims that he was denied promotions because of his race
and gender; he seeks equitable relief under Title VII of
the Civil Rights Act of 1964, as amended, 42 U.S.C.
§§ 1981a, 2000e through 2000e-17, and the Fourteenth
Amendment to the United States Constitution, as enforced
through 42 U.S.C. § 1983.[1]    Rogers names several ADOC

_____

    1.  The court must note that it has been quite
difficult to maintain a grasp of Rogers's claims, for
                                    (continued...)

supervisors and other employees as defendants. He properly invokes the jurisdiction of the court pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and 42 U.S.C. § 2000e-5(f)(3) (Title VII). The matter is now before the court on the defendants' motion for summary judgment. For the reasons that follow, the motion will be granted in part and denied in part.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56,

---

1.  (...continued)
with almost each filing he adds and deletes contentions (both factual and legal), such that his claims have been moving targets for the court. If, throughout this opinion, the court has incorrectly distilled the current status of Rogers's case, Rogers should so notify the court within seven days from the date of this order.

the party seeking summary  judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).  The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that

party's favor.  <u>Matsushita Elec. Indus. Co. v. Zenith</u> <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II.  FACTUAL BACKGROUND

Under Alabama law, employment registers are used to determine the eligibility of applicants for appointment and promotion to all state merit-system positions.  A register results from a ranking of the scores job applicants receive on an examination.  Before a state agency, such as ADOC, can make an appointment to fill a job vacancy, it must request a "Certification of Candidates."  The agency must select a candidate from the list of certified eligibles.

At the time of the events giving rise to this litigation, ADOC and all other state agencies were subject to a 1970 injunction in <u>United States v. Frazer</u>, 317 F.Supp. 1079, 1091 (M.D. Ala. 1970) (Johnson, J.), which provided that:

> "Defendants shall not appoint or offer
> a position to a lower-ranking white

4

> applicant on a certificate in preference to a higher-ranking available Negro applicant, unless the defendants have first contacted and interviewed the higher-ranking Negro applicant and have determined that the Negro applicant cannot perform the functions of the position, is otherwise unfit for it, or is unavailable. In every instance where a determination is made that the Negro applicant is unfit or unavailable, documentary evidence shall be maintained by the defendants that will sustain that finding."

This provision, which embodied what is now called the 'no-bypass rule,' prohibited Alabama state officials from bypassing a higher-ranked African-American applicant in favor of a lower-ranked white applicant on a certificate of eligibles. The rule was imposed in response to evidence that, up until 1970, the State of Alabama had unabashedly refused to hire and promote African-Americans to almost any and all non-menial positions in state government because of their race.[2]

_____

2. On May 20, 2005, the Frazer no-bypass rule was suspended. United States v. Flowers, 372 F.Supp.2d 1319 (M.D. Ala. 2005) (Thompson, J.). As a result, state officials, including the defendants in this case, are no (continued...)

Rogers has been employed for more than 25 years as a correctional officer at Elmore Correctional Facility in Elmore County, Alabama; at the time of the filing of this lawsuit, he held the rank of correctional officer II, or sergeant. He was promoted once to his current position and has sought promotion to the next rank of lieutenant for several years. In order to remain eligible for promotion, he has repeatedly taken the examination that correctional officers at the rank of sergeant are required to take and pass in order to be promoted to the next rank. Although he has passed the examination, he has not received a promotion to lieutenant.[3]

Rogers points to two promotions he contends he did not receive in violation of federal law. First, in May 1998, he interviewed for a correctional officer supervisor I position at Easterling Correctional

_____

2. (...continued)
longer obligated to enforce the rule.

3. Rogers does not contend that the test itself was racially discriminatory.

6

Facility; he did not receive that promotion, and the person who did was Jeffery O. Knox, a black male. Rogers contends that he did not receive this promotion because of his race; he claims that, but for the <u>Frazer</u> no-bypass rule, he would have been promoted.

Second, Rogers claims that he did not receive a promotion in 2000 because of his race and gender. He provides the affidavit of Ronald L. Weaver, a retired ADOC warden, who states that, in early 2000, there was an opening for lieutenant with the rank of correctional officer supervisor I at the Loxley Community Base Facility. Weaver continues that he interviewed Rogers and several other applicants for the position whose names were on a list certified to him. The list included "three whites, one female, one black, and one American Indian classification." Weaver then explains that he would have recommended Rogers for the position but for the <u>Frazer</u> no-bypass rule, which he understood to restrict the appointment of whites over more qualified

blacks as well as the appointment of males over more qualified females, as follows:

> "Pursuant to the promotional procedures of the Alabama Department of Corrections and the <u>Frazier</u> [sic] case requirements, even though five people were certified, I could only choose between the white female or the black. After interviewing the candidates, the best qualified candidate and my choice for the position was Robert L. Rogers. However, because of the promotional procedures of the Alabama Department of Corrections and the <u>Frazier</u> [sic] case requirements that I was required to follow, I could not hire Rogers, but had to hire either the white female or the black male. Thus, I did not recommend Rogers to be hired. ... But for the hiring limitations, I would have recommended Robert L. Rogers for the position."

### III. DISCUSSION

#### A.  Title VII

Initially, the court finds that Rogers cannot succeed on his claims under Title VII because he did not timely file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within the 180 days

8

required by law.  42 U.S.C. § 2000e-5(e)(1) requires that "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." See also Pijnenburg v. West Georgia Health Sys., Inc., 255 F.3d 1304, 1305 (11th Cir. 2001) ("It is settled law that in order to obtain judicial consideration of [a Title VII] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred."). The 180-day period begins when the employee knows or reasonably should know that he has been discriminated against. Delaware State College v. Ricks, 449 U.S. 250, 261-62 (1980).

The record reflects that, at some point prior to this litigation, Rogers may have attempted to file a charge with the EEOC, covering or related to the claims asserted in this litigation, but the EEOC has no record of receiving his charge. Therefore, the defendants are entitled to summary judgment on his Title VII claims.

9

See, e.g., Thomas v. Kroger Co., 24 F.3d 147, 150-51 (11th Cir. 1994) (affirming summary judgment for employer on Title VII claim where it was undisputed that employee failed to file an EEOC charge of discrimination relating to the challenged conduct); Stafford v. Muscogee County Bd. of Educ., 688 F.2d 1383, 1387 (11th Cir. 1982) (affirming summary judgment for employer because plaintiff did not file EEOC charge within 180 days of realizing he had not been selected for each of a series of promotions).

### B.  § 1983

Because Rogers's Title VII claims are barred, his claims must be addressed solely under § 1983.  Rogers claims that the actions of ADOC officials violated his constitutional right to equal protection, as enforced by § 1983.

Under the equal protection clause of the Fourteenth Amendment, "No State shall ... deny to any person within

10

its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "The central purpose of the Equal Protection Clause ... is the prevention of official conduct discriminating on the basis of race." <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976). The Constitution protects Rogers's right to be free from purposeful, race- and gender-based discrimination on the part of an employer. <u>See</u> <u>Burns v. Gadsden State Community College</u>, 908 F.2d 1512, 1517-18 (11th Cir. 1990) (per curiam).

The only relief Rogers appears to seek is prospective injunctive relief against the defendants in their 'individual' and 'officials' capacities. Because only the State of Alabama can provide such relief and because the State is in this litigation only to the extent the defendants have been sued in their official capacities, <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985), (official-capacity lawsuits are, "in all respects other than name, ... treated as a suit against the entity"), the requested relief can be provided by the defendants in

their official capacities only. The defendants are therefore due summary judgment in their individual capacities, because their presence in their individual capacities is unnecessary.[4]

i.

Rogers claims that, because of ADOC's recruitment polices, he was denied the 1998 and 2000 promotions described above.

ADOC had an affirmative action plan and sexual harassment policy that were implemented through Administrative Regulation (AR) 206. Section I(B)(1) of AR 206 stated until February 22, 2000, that one of the

_____

4. The defendants would be liable for damages in their individual capacities for violating § 1983, but Rogers is not seeking damages.

In addition, because Rogers is not seeking damages, the court need not address the defendants' affirmative defense of qualified immunity. The doctrine of qualified immunity insulates government agents against personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982); Greason v. Kemp, 891 F.2d 829, 833 (11th Cir. 1990).

12

plan's objectives was "To insure that a targeted recruitment program is coordinated, implemented, and designed to reach and attract qualified blacks and women applicants." This provision was based on requirements in _Frazer_ that state officials "shall adopt and implement a program of recruitment and advertising which will fully advise the Negro citizens of the State of Alabama of the employment opportunities available to them with the State of Alabama agencies," _Frazer_, 317 F.Supp. at 1093,[5] which

---

5.  The _Frazer_ order provided in more detail that:

> "3. The defendants shall adopt and implement a program of recruitment and advertising which will fully advise the Negro citizens of the State of Alabama of the employment opportunities available to them with the State of Alabama agencies. This program shall include a rearrangement of regular places for administering merit system examinations so that at least 25 percent of those places consist of predominantly Negro high schools or other institutions. The defendants shall also revise their permanent mailing list of the State Personnel Department to include all predominantly Negro educational institutions and vocational
> (continued...)

requirements were, in turn, based on a court finding that state officials had mainly targeted white high schools, white colleges, white businesses, and other white sources for job applicants.  _Id_. at 1089.[6]

---

5.    (...continued)
schools, and radio and television stations and newspapers; and for positions in which a high school education or less is required, the defendants shall be required to mail announcements of such positions, together with other related materials, to all the institutions indicated above, as well as to predominantly Negro high schools.

"4. The defendants shall institute regular recruitment visits to predominantly Negro high schools, business and vocational schools, and colleges and universities throughout the State of Alabama, such visits to be made in person by appropriate officials of defendant agencies from both local and central offices."

_Frazer_, 317 F.Supp. at 1093.

6.    Unlike the no-bypass rule, _see supra_ note 2, _Frazer_'s recruitment requirements, as far as the court knows, have not been suspended or terminated.

14

Rogers contends that ADOC was operating a targeted recruitment program that discriminated against him as a white male. Specifically, he argues that ADOC's recruitment efforts resulted in an overall employee population that included more blacks than whites, which in turn meant that more blacks were eligible to take the promotional examination than whites. Thus, Rogers states, he was disadvantaged by an "influx of blacks" who were competing with him for a promotion.

First of all, Rogers has not shown that he was damaged by the alleged targeted recruitment program; he has not shown that, in the absence of the program, he would have, in fact, been promoted.

Second, the defendants contend that ADOC has not actually implemented this section of its affirmative action plan for several years prior to the promotions at issue, and, in support, they offer sworn affidavits of ADOC Training Director Michael Waters and ADOC Personnel Director Mable Thomas.

15

In his affidavit, Training Director Waters states that he has been involved in the recruitment process for ADOC and that, during the time at issue, ADOC has not been involved in so-called "targeted recruitment"; in describing his recruitment efforts at Alabama colleges and universities, military job fairs, and other forms of publicity and outreach, he states that, "My philosophy has been to cast a broad net and try to recruit as many people as possible regardless of color or sex."

Personnel Director Thomas statesd in her affidavit that she was employed as personnel director from April 12, 1997, until May 31, 2001, and that, because ADOC had no personnel director for two years before she was hired, "Most of the departmental regulations were extremely outdated." Although § I(B)(1) was copied from State Personnel Department guidelines into several succeeding versions of AR 206 until 1996, Thomas states, "The Department of Corrections never implemented most of the areas in Regulation 206 because there was no need to

16

implement them." Thomas explained that ADOC has not lacked black or women employees for a significant period of time: "The Department of Corrections has always received compliments from the State Legislature regarding its diversity."

Thomas also states that "Recruitment efforts have never been targeted to a specific group of applicants." She provides statistics to show that the two most recent employment registers contained more black applicants for employment than white applicants. She states that these statistics reflect the fact that more blacks have applied for employment than whites for a number of years, adding that, "While Corrections at some point may have had 64 % black employees, it was not by design." Thomas also notes that, while ADOC has a majority of black employees, whites outnumber blacks in all supervisory positions.

Although Rogers has argued that ADOC has operated a recruitment program that unlawfully discriminates against whites and men, he has not met his initial burden to

produce facts demonstrating that such discrimination has occurred. Even when the facts are construed in the light most favorable to him, it is clear that, while ADOC may have operated an 'expanded' recruitment program that reaches all segments of society, it has not operated a 'targeted' recruitment program, and, particular, there is no evidence that it has operated a program that excluded, or even had a restricted reach for, white applicants. The ADOC Personnel Director and Training Director, who are both responsible for recruitment efforts, have testified that those efforts did not target any particular group and have not for years. Rogers has provided no evidence to contradict their testimony, other than pointing to the fact that there simply are more black employees at ADOC. The racial breakdown of employees could be due to many factors other than the existence of targeted recruitment; indeed, it could be due to a clearly legal expanded recruitment program. Moreover, Rogers has failed to rebut the reasonable

18

conclusion that Thomas and Waters are in the best position to know what ADOC's recruitment policy and practice have been. Without any evidence that ADOC is operating a discriminatory recruitment program, there is no equitable relief this court could order.[7]

Third and finally, whether the defendants' recruitment program is characterized as targeted or expanded, there is nothing in the record to undermine the conclusion that the program has required the defendants to do anything other than "hiring or promoting the best qualified applicant regardless of race," Shuford v. Alabama State Bd. of Educ., 846 F.Supp. 1511, 1531 (M.D. Ala., 1994) (Thompson, J.), or gender; under the recruitment program, "no position is ever closed to white applicants," id., or male applicants. "Qualified white [male] candidates simply have to compete with qualified

_____

7. According to documents attached to the defendants' motion for summary judgment, AR 206 was revised on February 22, 2000, and the language objected to by Rogers was removed.

19

black candidates," <u>United States v. Paradise</u>, 480 U.S. 149, 183 (1987), and qualified female candidates.

### ii.

As stated, Rogers claims that he was denied a 1998 promotion because of his race.  The evidence shows that, in May 1998, he interviewed for a correctional officer supervisor I position at Easterling Correctional Facility; that he did not receive that promotion; and that the person who did was Jeffery O. Knox, a black male.  However, the evidence does not support his claim that he was denied the position because of <u>Frazer</u> or for any reason connected to his race.

The promotional register for a contemporary available Ventress Correctional Facility position, which the parties have stipulated was used for the available Easterling position as well, dated May 5, 1998, reflects that the candidates were ranked in the following order of their scores:

| James Stephens | White | 93.58 |
|---|---|---|
| Victor Napier | White | 93.50 |
| Marion Espy | White | 93.27 |
| Enoch Parks | Black | 91.03 |
| Jimmie Henderson | Black | 90.66 |
| Larry Floyd | Black | 90.54 |
| Robert Rogers | White | 90.50 |
| Mark Pelzer | Native American | 89.94 |
| Jeffery Knox | Black | 89.81 |
| Carl Sanders | Black | 88.79 |

It is evident from the register that, because Rogers ranked higher than Knox, Frazer never came into play between the two and thus was not determinative; Frazer would have restricted the selection of Rogers over Knox only if Knox had ranked higher than Rogers. Moreover, neither Rogers nor the defendants have presented any evidence that Frazer otherwise played any role, proper or improper in the 1998 promotion.

The defendants also offer specific reasons for Rogers's non-selection for the 1998 promotion. The affidavit of Warden Gwendolyn Moseley states that, on

June 2 and 4, 1998, interviews were conducted to determine recommendations for correctional supervisor I at Easterling.  Five of the ten certified candidates were interviewed:  Stephens, Napier, Floyd, Rogers, and Knox. Two on the register had already been promoted and the remaining three did not attempt to schedule interviews. Moseley stated that, during the interviews, two individuals stood out, Napier and Knox.  Moseley explains that,

> "Sgt. Napier and Sgt. Knox both showed great job knowledge, situational judgement and presented the same concepts of management as the current administration.  Both candidates being equal, Sgt. Knox is recommended for this position because of his familiarity of Easterling's operation, being assigned since 1990.  He is from the local area, which gives the needed stability to the supervisory staff, and he has been placed in the position of Shift Commander for extended periods and performed exceedingly well."

In her memorandum supporting Knox, Moseley concluded that, "Because of these factors, I feel strongly that

Jeffery Knox should be promoted to Lieutenant at Easterling Correctional Facility."

The question, therefore, for the court is whether the reasons given by Moseley in support of the selection of Knox were a pretext for racial discrimination. In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court established the allocation of the burden of production and an order for the presentation of proof in discrimination cases. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). Under the McDonnell Douglas approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful race discrimination by a preponderance of the evidence. 411 U.S. at 802. For the usual disparate-treatment case, a plaintiff establishes a prima-facie case of race discrimination by showing that he was subjected to adverse job action, that his employer treated similarly situated employees of another race more favorably, and

that he was qualified to do the job.  <u>Holifield v. Reno</u>, 115 F.3d 1555, 1561-1562 (11th Cir. 1997).

If the plaintiff establishes a prima-facie case of race discrimination, the burden then shifts to the defendants to rebut the presumption by articulating legitimate, non-discriminatory reasons for their employment action.  <u>Holifield</u>, 115 F.3d at 1564.  Once the defendants satisfy this burden of production, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted).

The establishment of a prima-facie case does not in itself entitle a plaintiff to survive a motion for summary judgment.  <u>Grigsby v. Reynolds Metals Co.</u>, 821

F.2d 590, 595 (11th Cir. 1987); <u>Pace v. Southern Ry.</u>
<u>System</u>, 701 F.2d 1383, 1389 (11th Cir. 1983). After the
defendants proffer nondiscriminatory reasons for their
actions, "[i]n order to avoid summary judgment, a
plaintiff must produce sufficient evidence for a
reasonable factfinder to conclude that each of the
[defendants'] proffered nondiscriminatory reasons is
pretextual." <u>Chapman</u>, 229 F.3d at 1037.

Here, assuming that Rogers has established a prima-
facie case, the court must still conclude that summary
judgment is due against him. The defendants have
articulated compelling reasons for the selection of Knox
over Rogers, and Rogers has offered no credible evidence
that would support the conclusion that their reasons are
pretextual for race.

iii.

Rogers claims that he was denied a promotion in 2000
because of his race and gender. In support, he has

25

submitted the affidavit of Weaver, who admits that he would have recommended Rogers for the position but for **Frazer**, which he understood to restrict the appointment of whites over more qualified blacks as well as the appointment of men over more qualified women.

The promotional register for the 2000 promotion, a "Certification of Candidates" for Loxley Work Camp, dated February 25, 2000, reflects that the candidates were ranked in the following order of their scores:

| Cheryl Jackson | White | 94.34 |
| Robert Pivonka | White | 93.98 |
| Robert Rogers | White | 90.50 |
| Mark Pelzer | Native American | 89.94 |
| Wayne Gray | Black | 86.01 |

It is apparent from this list that **Frazer** was inapplicable to the selection process. Because no black ranked higher than Rogers and because there is nothing in the **Frazer** no-bypass rule to indicate that it applies to

women, Rogers could have been picked without violating
Frazer.

Nevertheless, in support of this self-evident
conclusion, the defendants have submitted two affidavits
asserting a different version of ADOC's actual
promotional policies than is reflected in Weaver's
affidavit. Paul Thomas, the manager of recruitment and
examinations for the State Personnel Department, confirms
in his affidavit that, when a state-employment position
needed to be filled, the state agency requested the State
Personnel Department to certify a list of candidates,
from which the appointing authority selected. Thomas
adds that, while "Under the Frazer no-bypass rule, a
higher ranking African-American cannot be skipped in
order to hire a lower ranking white[] ... [g]ender is not
a factor to be considered under Frazer." Thomas states
that, according to his review of the February 2000 Loxley
Work Camp promotional register, "Robert Rogers ranked
third on the register and was in an appointable position

27

because there was not a higher-ranking African American. <u>Frazer</u> did not interfere with the Department of Corrections' ability to appoint Rogers if they so chose."

Second, Dora Jackson, the current ADOC Personnel Director, states in her affidavit that, "The 'Frazer Order' does not have a provision that prohibits the 'passing over' of a White female to select a lower ranking White male on a certified register or a Black Female to select a Black male." She continues that, "The Department of Corrections does not nor has ever had a gender-based policy that prohibits the 'passing over' of a higher ranked qualified White female to select a lower ranked qualified White male."

Nevertheless, Weaver's affidavit does show that, as a warden, he purposely discriminated against Rogers on the basis of race and gender in the 2000 selection; thus, Rogers has presented evidence that he was a victim of purposeful, illegal discrimination. Admittedly Weaver was incorrect in his belief that <u>Frazer</u> and ADOC required

28

him to promote a black or female employee if either appeared anywhere on the register; but, correct or not, what Weaver did, if in fact he did what he said he did, was illegal.

If a plaintiff offers 'direct evidence' of discrimination--that is, "evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption," <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir.1998)--then the defendant must prove by a preponderance of the evidence that the same employment decision would have been made regardless of discriminatory intent. <u>Id</u>. Here, with Weaver's affidavit, Rogers has presented direct evidence of discrimination, and the defendants have not proven, as a matter of law, that the same employment decision would have been made regardless of Weaver's discriminatory intent.[8]

_____

8. As stated, Rogers seeks only prospective (continued...)

Rogers is, therefore, entitled to a trial on whether he was denied the 2000 promotion because of his race and gender, and, if so, whether he is entitled to prospective injunctive relief.    The defendants' summary-judgment motion will be denied as to the 2000 promotion to the extent Rogers seeks prospective injunctive relief from the defendants in their official capacity.

An appropriate judgment will be entered.

Done, this the 23rd day of March, 2006.

　　　　　　　　　　　　　　　　 /s/ Myron H. Thompson
　　　　　　　　　　　　　　 UNITED STATES DISTRICT JUDGE

---

    8.    (...continued)
injunctive relief at this stage in the litigation. However, if he did seek damages, they would be available from only Weaver in his individual capacity, for Weaver is the only one who intentionally discriminated against Rogers because of his race and gender.  But Rogers cannot recover damages from Weaver because Weaver is not a defendant in this case.  Nor can Rogers recover damages from the State, even though he worked for the State, or from the defendants in their official capacities, because, under the Eleventh Amendment, they are immune from damages. Kentucky v. Graham, 473 U.S. 159 (1985). And, finally, Rogers cannot recover from the defendants in their individual capacities because there is no evidence that they intentionally discriminated against him because of his race or gender.